**Mary PICADURA, Appellant,**

v.

**Walter A. HUMPHREY, Mrs. Walter A. Humphrey, Grace E. Ford, James E. Ford, Allie G. Crawford, William Crawford, Wade H. Ford, Edna Ford, James Edwin Ford, Jr., and Mrs. James Edwin Ford, Jr., Respondents.**

No. 47478.

Supreme Court of Missouri,

Division No. 1.

May 9, 1960.

Herbert S. Brown, Trenton, for appellant.

J. K. Owens, Kansas City, for respondents.

COIL, Commissioner.

This is an appeal by plaintiff from a decree for defendants in her suit to set aside a 1936 judgment on the ground of fraud in its procurement and to revest title in her as a contingent remainderman of an undivided one-half interest in 400 acres of land. Title is directly involved and thus this court has appellate jurisdiction. While all the defendants below are shown as respondents in the caption above, only respondents Walter A. Humphrey and his wife have filed a brief.

Wade H. Humphrey (sometimes called "Humphreys" in deeds and other instruments in evidence) owned, among other real estate, 495 acres in Grundy County. On November 9, 1936, he and Lenna, his second wife, executed a deed conveying the 495 acres to Wade's only two children, W. A. Humphrey and Grace E. Ford, and their bodily heirs, reserving to grantors a life estate. That deed was recorded the next day, November 10, 1936. (We have said that the deed conveyed the land to W. A. Humphrey and Grace Ford and their bodily heirs because the parties apparently agree that the deed in question should be so construed, and we shall proceed on that premise.) At the time of the November 1936 deed (hereinafter called the bodily heirs deed) and at the time of the present trial, W. A. Humphrey, grantor Wade Humphrey's only son, had one daughter, Mary, the present appellant, and Grace Ford, grantor Wade Humphrey's only daughter, and her husband had three children, Wade H. Ford, James E. Ford, Jr., and Allie Crawford. Thus the bodily heirs deed conveyed, subject to the grantors' life es-

tate, a life estate in an undivided one half to each W. A. Humphrey and Grace Ford, and contingent remainders in an undivided one half to the plaintiff and to the three Ford children, the bodily heirs of W. A. Humphrey and Grace Ford, respectively, with the reversion to the grantors (Wade and Lenna Humphrey), their heirs, assigns, or devisees, pending the determination of the vesting of the original grant or its falling in for want of takers as "bodily heirs" of the grantees for life. Mattingly v. Washburn, 355 Mo. 471, 196 S.W.2d 624, 626[1, 2].

On May 6, 1937, W. A. Humphrey and present plaintiff, who was then Mary De Rosette, signed the following document:

."In the Circuit Court of Grundy County, Missouri

"W. S. Humphreys, and
Lenna Humphreys,                                         Plaintiffs,
          vs.                                            No. 1401
. W. A. Humphreys, Mary Virginia
De Rosette, Grace E. Ford, Allie Grace
Crawford, W. F. Ford, and James Edward
Ford, Jr.,                                              Defendants

"Entry of Appearance

"We, the undersigned defendants, in writing enter our personal appearance to the above entitled cause and we waive the issuance of summons against us and further state to the court that we desire the court to grant the prayer of the petition.

"Walter A. Humphrey          /s/
"Mary Virginia De Rossette /s/

"State of Missouri } ss
County of Livingston }

"Subscribed and sworn to before me this 6th day of May, 1937, by the above named defendants, W. A. Humphrey and Mary Virginia De Rosette.

"Scott J. Miller          /s/
"Notary Public

"(Seal)
"My Commission expires November 18, 1940."

---

Grace Ford and her three children aforenamed also signed an "entry of appearance," presumably in the same form and of the same content as the one set out above, sometime prior to May 18, 1937. On May 18, 1937, case 1401 (although the entries of appearance and requests for relief had been signed theretofore) was filed. The petition in case 1401 sought to reform the bodily heirs deed on the ground of mistake by eliminating therefrom, following the names of the grantees, the words "and their bodily heirs" and by eliminating therefrom the words which reserved a life estate in grantor Lenna, so that the deed, if reformed as prayed, would convey the 495 acres in fee to Walter and Grace subject to a life estate in Wade Humphrey only. On June 7, 1937, an answer was filed ostensibly on behalf of all the named defendants in which the allegations of the petition were admitted and all defendants prayed that the relief sought by plaintiffs be granted. On June 12, 1937, the court rendered its decree finding that "from the evidence offered" it appeared that if the corrections sought were made the deed would accord with the true intention of the par-

ties to it and the deed was so reformed. That decree was recorded but the date thereof was not shown. On June 21, 1937, Grace Ford and her husband conveyed to their three children (who were all of their bodily heirs and had been contingent remaindermen in the bodily heirs deed) their undivided one half in the 495 acres, reserving in grantors a life estate.

A deed dated August 31, 1937 and, according to the deed, acknowledged by certain of the grantors on August 31 and by others on September 13, 1937 (as will later be developed, the time when present plaintiff and her husband executed this deed is of decisive importance) by which Walter Humphrey and his wife, present plaintiff and her then husband, Grace Ford and her husband and their three children conveyed back to grantor, Wade H. Humphrey, ninety-five of the 495 acres included in the bodily heirs deed. On November 30, 1938, that same 95 acres was conveyed to a bank by Wade and his wife Lenna in settlement of some of Wade's indebtedness.

It was agreed that the attorney who represented plaintiffs in the reformation suit and who notarized the signatures of W. A. Humphrey and his daughter, the present plaintiff, on the "entry of appearance," was deceased at the time of the present trial; that W. A. Humphrey was 68 and his sister Grace Ford was 69 at the time of the trial of this case; that Wade H. Humphrey died on October 7, 1955; and the present suit was filed February 29, 1956.

It was and is plaintiff's contention that the decree in the reformation suit was procured by fraud in that her father, with the connivance or acquiescence of her grandfather and his lawyer, obtained her signature on the document entitled "entry of appearance" by false and fraudulent representations as a result of which the decree reforming the bodily heirs deed was obtained and as a further result of which she did not know that she had entered her appearance in or had consented to a judgment of reformation as prayed and did not know that there was a proposed suit or that such proposed suit was filed and pursued to judgment; that those facts were intentionally and fraudulently concealed from her to prevent her discovering the existence of the reformation decree and that she learned for the first time that she was no longer a contingent remainderman in the bodily heirs deed in 1956 shortly before the filing of the present action.

It was and is the contention of Mr. and Mrs. Walter Humphrey that plaintiff failed to sustain her burden to prove by clear and convincing evidence that the decree in the reformation suit was procured by fraud but that, on the contrary, the evidence shows that plaintiff signed the entry of appearance knowingly and voluntarily, and further that in any event her present action is barred by the statute of limitations.

Plaintiff at trial time lived in the State of California and in 1937 was 25 and married to Melvin Du Rosette (sometimes spelled De Rosette). She testified that during her childhood her father and mother had frequently quarreled and had often separated; that since the age of 16 she had not lived in any home with her father and that she and her father had never been very friendly with each other; that in 1937 she and her husband were living in Kansas City and in the spring, probably in May of 1936 or 1937 (all the evidence is that the year was 1937), her grandfather, her father, and the lawyer who notarized her signature on the "entry of appearance," came to her home; that they were in a hurry and as a result did not enter the house but she and her husband went to their visitors' automobile where her father explained that her grandfather had incurred indebtedness by reason of some back taxes which had to be paid and that the only way her grandfather could discharge that indebtedness was to convey to his creditors 95 acres of land and that they wished her to sign two papers necessary to accomplish that proposed conveyance; that she signed the two papers but does not recollect what they were; that while she did not at that time know about

the bodily heirs deed in the sense that she had seen it, she had understood and did then understand that there was in existence an arrangement whereby the 495 acres described in the bodily heirs deed was to be hers at a time in the future; that she specifically asked whether, by signing the papers presented to her, she would convey away her interest in the whole tract and that her father answered, "definitely not"; that she had had no experience in matters connected with the conveying of real estate.

Plaintiff testified further that at that time she knew nothing of and was not advised of any suit pending in Grundy County or of any proposed suit with respect to or involving the bodily heirs deed or in connection with any land in which she might have an interest; that such a case or proposed case was not discussed or mentioned on that occasion; that the first time she ever heard that there was such a case was in 1956 after she employed her present lawyer; that she had not appeared in the reformation case, did not employ or authorize any lawyer to represent or appear for her; that the period covered by the conversation and the signing took from 15 to 30 minutes and her grandfather spoke only a couple of words; that her husband signed only one of the papers and she and her husband did not appear before any notary; that she does not remember what other names were on either of the papers when she signed them.

Plaintiff also testified that she knew she did not sign the deed dated August 31, 1937, heretofore mentioned (hereinafter called the 95-acres deed) on the date it bears, because her father was at her house only one time to have her sign papers and she was positive that she signed no papers other than the two on that one occasion in May 1937; that when she signed those papers (the 95-acres deed and the entry of appearance) Mrs. Walter Humphrey was not present; that she had not met the lawyer who was with her father prior to the time she signed the papers on May 6

and had never been in his office at Chillicothe and did not sign the entry of appearance in Livingston County.

It was agreed that plaintiff received no consideration for signing either the entry of appearance or the 95-acres deed.

Defendant Walter Humphrey, plaintiff's father, testified that he executed the entry of appearance dated May 6, 1937 on his father's farm at Galt, Missouri; that he (at the time apparently living in Kansas) had gone there at his father's request as he had done often around that time due to problems his father had in connection with taxes; that the lawyer who notarized his signature on the entry of appearance, arrived at the farm with the entry of appearance and that he, Walter, signed it; that he did not know that his daughter Mary had signed an entry of appearance; that he took no part in the reformation suit, did not know that a judgment was rendered therein but that all matters in connection with it were left to his father; that he did not employ a lawyer to file an answer in his behalf in the reformation suit; that he did not know about the bodily heirs deed but that his father had told him that the scrivener had made a mistake in putting the words "bodily heirs" in the deed; that some time after he had signed the entry of appearance he received the 95-acres deed in the mail with instructions that he and his wife and his daughter Mary and her husband were to sign it; that he and his wife went to his daughter's home (presumably on September 13, 1937) with the deed; that he there explained to her that his father (her grandfather) was indebted to the local bank and wanted to discharge that indebtedness; that all four parties signed the deed and acknowledged their signatures before the notary public as appears on the deed; and that he and his wife had no "entry of appearance" with them at the time and did not discuss an entry of appearance.

It is apparent that there is an irreconcilable conflict in the testimony of plaintiff

Mary and that of her father. We shall proceed to review the testimony of other witnesses which may aid in determining the credibility of the versions of the facts as recited by plaintiff and her father.

Lenna Humphrey's (Wade's wife and a grantor in the bodily heirs deed) deposition, taken in May 1956, was read in evidence. She testified that at the time of the bodily heirs deed the son Walter wanted his father to give him the land or the money for the land outright but that Wade wanted to reserve a home for his life, and that Walter complained about the "bodily heirs" provision; that she did not employ any lawyer to bring a reformation suit (although she did indicate that she had some knowledge that her husband was attempting to reform the deed) and did not authorize the filing of or know that a suit was filed in her name to reform the bodily heirs deed. Lenna also testified that in her opinion she and her husband had not made a mistake in including the words "bodily heirs" in the 1936 deed but that her husband simply wanted to change that provision.

The lawyer who signed the answer filed in the reformation suit on behalf of all defendants named in that suit and in which answer those defendants asked that the relief sought by plaintiff be granted, testified that he officed with the lawyer who had filed the reformation suit and while he remembered that Wade Humphrey was in that office a number of times, he did not know present plaintiff or Walter Humphrey or any of the Fords and was never employed by any of the parties on whose behalf he filed the answer and was not authorized by them to file it; that he did not take part in any trial of that case and was not in court the day the decree was entered; that he had never heard of the matter from the time he filed the answer in 1937 until two or three months before he testified in the present case; that he believed he would not have filed an answer unless someone asked him to but he cannot remember who asked or told him to do it.

The deposition of defendant Grace Ford (the daughter of grantor Wade) was read in evidence. She testified that she did not know of the existence of the reformation suit and had never heard of the lawyer who filed an answer on her behalf; that she first learned of the bodily heirs deed after her father had made arrangements to deed the 95 acres to the bank and she remembered signing some papers so that her father could deed the 95 acres to the bank to retire an indebtedness; and that according to her recollection the only reason for any proceedings with respect to the bodily heirs deed was so that her father could have the 95 acres to deed to the bank. She testified further that her and her children's signatures are on the 95-acres deed and she remembered signing it but did not remember who brought it to her for signature; that she and her husband had deeded their one-half interest in the 495 acres to their three children, reserving a life estate.

The deposition of plaintiff's former husband, Melvin Du Rosette, was read in evidence. He testified that plaintiff's father and grandfather brought some papers to his home to be signed; that plaintiff's father who did all the talking explained that her grandfather had "gotten in a hole" because of some back taxes and wanted to sell 95 acres of the land in order to save the rest of it and that he, the witness, signed one paper on the representation that it would enable the grandfather to dispose of 95 acres and thus pay some back taxes; that he did not see any entry of appearance; that they did not appear before a notary to sign the paper; that the papers were signed in an automobile in front of his house; and that he did not remember in what month he signed the papers.

James E. Ford, Jr., Grace's son, testified that he executed the 95-acres deed on August 31, 1937, along with his father and mother; that he knew about the bodily heirs deed at the time they brought some papers to him in California, Mis-

souri, for his signature, so that grantor could deed 95 acres to the bank in order to settle up for some back taxes; that he signed the petition [entry of appearance?] to change the bodily heirs deed by striking out the words "bodily heirs"; that the grandfather said he had made a mistake in deeding it to the bodily heirs; that he knew there was a lawsuit filed in Grundy County and that his signature was on the petition (the witness must have referred to the entry of appearance) but that he did not appear or testify in the case; that it was after the 95 acres had been deeded to the bank that his father and mother deeded the remaining 400 acres to him and his brother and sister; that he did not know the attorney who filed the reformation suit and he had not authorized any attorney to appear for him in that case.

Lena Humphrey, defendant Walter's wife, who signed the 95-acres deed as "Freada Humphrey," and who at trial time lived with her husband in Pittsburg, Kansas, recollected that in August 1937 she and her husband took a deed that he had received in the mail to his daughter's home in Kansas City for signature; that they (apparently she, her husband Walter, Mary, and Mary's husband Melvin) went to a notary, Bertha Van Renselair, who witness then knew but who has since died; that at that time the signatures of the Fords were on the deed; that she knew nothing of a bodily heirs deed or that there was a suit concerning it; that the only thing she ever heard discussed was the 95 acres.

We review this equity case de novo. We weigh the evidence and reach our own conclusions as to its weight. Ordinarily, where there is an irreconcilable conflict in the oral testimony, we defer to the trial court's finding on the issue of credibility. While the trial chancellor made no specific findings of fact and filed no conclusions of law, it is apparent that he believed defendant Walter Humphrey and did not believe the testimony of the plaintiff. Under usual circumstances we should defer to the trial chancellor in that respect, but we may not escape our responsibility to make our own findings on all issues, including the credibility issue, and we should not defer to the trial chancellor on that issue where, as here, we are of the view that the evidence as a whole, taking into account the fact that the trial chancellor has found to the contrary, supports the credibility of the plaintiff's version of the facts. Upon a review of the whole record we have reached the conclusion that plaintiff has sustained her burden to prove by convincing evidence that the decree in the reformation suit was procured by fraud and that it should be set aside. We shall set forth the main reasons for that conclusion.

To us, a persuasive and overriding circumstance is demonstrated by this question, why would plaintiff, defendant Walter Humphrey's only child, whose relation to her father through the years had been generally unfriendly and strained, knowingly and intentionally and voluntarily, and without consideration, have executed an entry of appearance and a request that the relief sought be granted, when the immediate and certain effect thereof was to lose all of her contingent remainder interest in an undivided one half of 400 acres of land for the sole benefit of her father? Her action could not have benefited her grandfather; only her father and his sister could gain by plaintiff's act and it is significant that nine days after the decree in the reformation suit, the sister Grace and her husband conveyed to their three children (who had been the bodily heirs in the former deed) their undivided half of the 495 acres. It would appear, then, as the most reasonable inference, that the reformation suit was for the sole benefit of defendant Walter; for, as noted, apparently the Fords desired the same result (as that attained by the bodily heirs deed) in any event and went along with the reformation suit to enable Walter to destroy his daughter's remainder interest. The evidence does not furnish any reason-

able explanation for plaintiff knowingly, voluntarily, and without consideration, handing over her undivided one-half interest in 400 acres of land to an unfriendly father. Her action in signing the entry of appearance seems reasonable only if it was done under the conditions and circumstances and upon the representations to which she testified.

It seems to us, therefore, that if we should say that plaintiff did not testify truthfully, we are thereby forced to the conclusion that plaintiff voluntarily gave up an undivided one-half interest (contingent on her surviving her father) in 400 acres of land, without consideration therefor, not to her grandfather to reconvey as he might see fit, but to her father with whom she had not lived since she was 16 and with whom she had never been friendly, and when, as we have said, there is nothing in the record to suggest any reason for such action by plaintiff.

Walter testified that he took no part in the reformation suit other than to sign the entry of appearance, did not even know there was a judgment in that suit, and did not know about the bodily heirs deed other than that his father had said he made a mistake in including the bodily heirs provision. That testimony is not convincing when it is considered that, as noted, Walter was the only person who was to benefit by the reformation decree.

Mrs. Grace Ford, a defendant in the present case, testified by deposition, read as part of plaintiff's case, that her recollection was that the *only* reason for any proceeding concerning the 495 acres involved in the bodily heirs deed was so that her father could obtain the 95 acres to convey to the bank to retire an indebtedness there. It is significant, and to us a persuasive circumstance, that Mrs. Ford also knew nothing of the reformation suit and thus, obviously, she, like plaintiff, did not realize that she had signed an entry of appearance and a request that the relief sought be granted in that suit. On the contrary, she, like plaintiff, apparently believed that all the papers she signed were only for the purpose of helping her father to retire an indebtedness at the bank.

Then there is the circumstance that Lenna Humphrey, Wade's widow and one of the grantors in the bodily heirs deed and a plaintiff in the reformation case, knew nothing of that suit and had not authorized its filing. Furthermore, none of the defendants in the reformation suit who testified in the present case authorized the lawyer to file an answer for them therein.

We are cognizant of the fact that in sustaining plaintiff's version of the transaction we must accept her statement that she and her husband executed the 95-acres deed at the same time she executed the entry of appearance (i. e., on May 6 or in any event prior to May 18, 1937), even though that deed was dated August 31, 1937, nearly four months after the entry of appearance was dated, and even though the deed on its face purports to have been acknowledged by plaintiff and her husband on September 13, 1937. But if it is true, as plaintiff testified, that her father represented to her that both papers, that is, the entry of appearance and the deed, had to be signed by her at that time for the sole purpose of enabling her grandfather to get back 95 acres of the 495 in order to settle an indebtedness at the bank, then it is reasonable to assume that she and her husband must have signed an undated 95-acres deed and one which was later signed by Walter and his wife, and that their signatures, along with those of plaintiff and her husband, were notarized by the notary who Mrs. Walter Humphrey knew but who was deceased at the time of trial. While we must agree that the matter of the 95-acres deed is a circumstance which is not too clear and is explainable only by inferences that may be drawn, still, when we again consider all the other surrounding circumstances which we have heretofore noted and another which we note hereinafter, it appears not unlikely that for a reason, which was a part of a

design and plan, defendant Walter presented to plaintiff and her husband for signature the then undated 95-acres deed at the same time, May 6, 1937, the entry of appearance was presented to Mary for signature.

There is another significant circumstance which points to that conclusion. The decree reforming the bodily heirs deed was entered June 12, 1937. Thereafter, by virtue of that decree, Mary, the present plaintiff, had no interest in the 495 acres conveyed by that deed as reformed. The fee, subject only to Wade Humphrey's life estate, was in her father, Walter. While the date on which that decree was recorded is not shown, the evidence does show that it was prior to the time of the recordation of the 95-acres deed. Consequently, it seems clear that on August 31, 1937 (the date of the 95-acres deed) or at any time after June 12, 1937, the date of the decree in the reformation suit, it was unnecessary that Mary, the plaintiff, execute the deed in order to convey the 95 acres to her grandfather. It seems unlikely, therefore, that Mary's grandfather or his counsel would have been seeking her signature on a deed in August or September 1937 when she, by then, had no interest to convey. And if it be said that perhaps the bank which eventually accepted the 95 acres in settlement of Wade's indebtedness, may have insisted that Mary and her husband sign the 95-acres deed, these additional circumstances should be noted.

While the record shows that Wade Humphrey was indebted to the bank on various notes in various amounts, it also shows that the only settlement involving the acceptance of 95 acres was approved by the bank's board of directors on November 26, 1938, and that the deed from Wade and Lenna to the bank was executed on November 30, 1938. So that despite the fact that the 95-acres deed to Wade was obtained from his two children and the grandchildren presumably in September 1937, the acreage thereby conveyed was not reconveyed to the bank until more than

a year later. Of course, it may well have been that negotiations for settlement of the particular note involved consumed more than a year but it is unlikely that the bank would have been insisting in August 1937 that Mary and her husband sign the 95-acres deed, despite the decree reforming the deed and eliminating Mary's interest and at a time more than a year prior to the bank's resolution to accept the 95 acres.

After considering all of the evidence and the reasonable inferences which seem to us to flow therefrom, we are of the opinion that the evidence as a whole supports plaintiff's version of the transaction. If plaintiff's version is accepted as the correct one, it seems clear that the judgment in the suit to reform the deed was procured by fraud. A judgment is procured by fraud where it results from conduct which "tends to trick an adversary out of a defense or to blind him to the pendency of an action." Fadler v. Gabbert, 333 Mo. 851, 63 S.W.2d 121, 132 [15]. Plaintiff's right, under the facts in this case, as we interpret them, to have the judgment in the reformation suit set aside is established by the case of Jones v. Arnold, 359 Mo. 161, 221 S.W.2d 187. There, similar relief was granted upon facts in many respects analogous to those in the present case. Here, as in the Jones case, plaintiff adduced testimony tending to prove that she had a meritorious defense in the suit to reform the deed. Lenna Humphrey, one of the grantors in the bodily heirs deed, testified in the present case that her husband did not make even a unilateral mistake, as he had alleged in his reformation petition, but, on the contrary, understood the meaning of "bodily heirs" and that he simply wished to undo that which he had knowingly done.

Defendants contend, however, that plaintiff's action herein, which was not brought until 19 years after the entry of the decree in the suit to reform the bodily heirs deed, is barred by Section 516.120

RSMo 1949, V.A.M.S. That statute provides in part that an action for relief on the ground of fraud shall be brought within five years, except that the cause of action shall be deemed not to have accrued until the discovery by the aggrieved party at any time within ten years of the facts constituting the fraud. As we have noted, this action was one to set aside a judgment in a deed reformation suit and to reinvest plaintiff with title as contingent remainderman to an undivided one-half interest in 400 acres of land. In the recent case of Hughes v. Neely, Mo., 332 S.W.2d 1, actions were brought in 1959 to cancel two 1930 judgments which had ostensibly terminated trusts in land, vested title in the life beneficiary of the trusts, and divested the title of the contingent remaindermen. Plaintiffs in the suits to set aside the judgments were contingent remaindermen, the children of the life beneficiary who was still living. The trial chancellor entered decrees finding the 1930 judgments null and void and ordered them set aside and cancelled. As against the contention on appeal that the actions were barred by limitations and laches, it was held, at 332 S.W.2d 6 [2–5], "that even as to vested remaindermen a statute of limitations cannot run until the end of the particular estate and * * * [c]ertainly that must be the ruling in this case to declare plaintiffs contingent remaindermen, brought while the life tenant is living, and in which the relief sought is removal of a cloud on such contingent interests." That holding is precisely applicable in the present case. Here the effect of the decree in the suit to reform the bodily heirs deed was to vest the fee to the land in the life tenants and to divest the titles of the contingent remaindermen. The present plaintiff was a child of the life tenant who was still living. Here, as in the Hughes case, the statute of limitations could not run until the end of the life estate.

There were two counts in plaintiff's petition. The second sought partition of the 400 acres. Plaintiff concedes on this appeal that she was not and is not entitled to partition the lands during the life of her father. The trial court entered judgment for defendants on count 2. Count 2 should have been dismissed without prejudice.

It follows that the judgment as to each count is reversed and the case is remanded with directions to enter a judgment dismissing count 2 of plaintiff's petition without prejudice and to enter a judgment on count 1 setting aside the June 12, 1937 judgment of the Grundy County circuit court reforming the bodily heirs deed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.