Perry C. RAGAN and Mary Ola Ragan, Plaintiffs-Appellants,

v.

Benjamin LOONEY et al., Defendants-Respondents.

No. 49877.

Supreme Court of Missouri, Division No. 2.

April 13, 1964.

274

Meredith B. Turner, Stewart, Reid & Turner, Springfield, for appellants.

Elvin S. Douglas, Douglas & Douglas, Bolivar, for respondents.

BARRETT, Commissioner.

This controversy between three sets of cousins, in essence an action to quiet and determine title to 200 acres of land in Polk County, arises out of "a flaw in the title" created when their grandfather in 1875 devised the land to his wife until death or remarriage then to three of his sons, the fathers of the present parties, and "the heirs of their bodies." Insofar as material here the 1875 devise was "and in the event of the death or marriage of my said wife, then and in that event, all of said * * * real estate shall descend· and absolutely belong to my said sons, Benjamin Leonidas Looney, Jesse Edward Looney and William Stanford Looney, and the heirs of their bodies."

In response to an action by one of the cousins, Ola Looney Ragan (an only survivor of one of the three sons), to quiet the title in her, the other thirteen cousins and one child of a deceased cousin filed an answer in which each claimed an undivided one-sixteenth interest. In addition they filed a cross bill in which they have attacked certain subsequently described proceedings and actions, and in a second count asked for partition of the land. The court found all issues against the plaintiff and her husband and instead of quieting the title in the plaintiffs has found that the plaintiffs and the defendants are tenants in common "in equal shares of an undivided one-sixteenth interest each" and accordingly has decreed partition, and the plaintiffs have appealed.

Jesse Edward Looney, mentioned in the will, was the father of the appellant-plaintiff, Mary Ola Ragan, and Benjamin L. and William S., with the exception of a child of a deceased grandchild, were the fathers of the respondent-defendants. In 1895 two of the sons conveyed their interests to the third brother, William S., and from his grantees, through deeds and mortgages the Hellman Commercial Trust and Savings Bank of Los Angeles, California, in 1913, came into whatever title the three sons may have had. In any event in 1913 the Hellman bank or its predecessor instituted an action in the Circuit Court of Polk County against the testator's nineteen grandchildren, the children of the three sons (who were all alive and either in person or by publication were served with process), to quiet the title to their 200 acre tract of land. The gist of Hellman's claim was that the grandfather's will had not been recorded, hence from an examination of an abstract of title it had no notice of the will and the interests of the testator's grandchildren, the present parties plaintiff and defendant. It was held in that suit that the 1875 will had been admitted to probate, that the fact appeared in the bank's abstract of title and therefore it was not an innocent purchaser entitled to cut off the testator's grandchildren as "heirs of the body" of the three sons. The consequence was that the bank had an estate for life, measured by the lives of the three sons, and the nineteen grandchildren-cousins owned the remainder. Hellman Commercial Trust & Savings Bank v. Looney, 271 Mo. 545, 197 S.W. 144.

And now to the circumstances involved in that suit giving rise to this action. The nineteen cousins, all defendants in the Hellman case, were minors and Mr. Herman Pufahl was appointed their guardian ad litem. Since Mr. Pufahl was a lawyer he also acted as counsel for the minors throughout the Hellman litigation and as indicated by the result successfully defended their rights and interests. Mr. Pufahl was appointed guardian ad litem for these minor children even though their fathers were then alive and aged, Benjamin L., 52, Jesse E., 50 and William S., 48, (William S. was said to have abandoned his children by 1913). The three sons died in 1947, 1958 and 1944, Jesse E., the father of the plaintiff Ola being the last to die in 1958 and after which event this litigation was commenced. In any event, after the filing of the mandate and opinion in the Hellman case Mr. Pufahl filed a motion in which he set forth the fact of his appointment and defense of the suit, including the fact that he had briefed and argued the case in this court, and therefore asked the court "to make him an allowance to pay" for his services to the minor defendants. Upon this motion the court entered an "interlocutory judgment" allowing Mr. Pufahl a fee of $500 but ordering personal notice to resident minors and notice by publication to nonresident minors. Thereafter, one of the minor defendants in that suit, Ola Looney, then married to Perry C. Ragan, appeared by counsel and filed a motion to set aside the interlocutory decree on the ground that "this court is without jurisdiction over said minors for the purpose of rendering said judgment." The court sustained that motion and thereby, of course, set aside the $500 allowance to Mr. Pufahl.

At the following term of court Mr. Pufahl instituted "an action for services rendered" against all the minor defendants. In the petition he set forth the fact of the Hellman bank suit, the fact of his appointment as guardian ad litem of the nineteen minors who were in fact the only defendants, and the fact of his rendition of services as their counsel and asked for a fee of $500. After service of process Mr. O. P. Hollingsworth, a lawyer, was appointed guardian ad litem of "all of the minor defendants" in Mr. Pufahl's suit. Subsequently, according to the court's records, Mr. Hollingsworth filed an answer for the minor defendants. It may be interpolated here that except for three cousins (one of whom was Ola's brother) who died without issue and with the noted exception of one great-granddaughter who is a respondent, all of these cousins, grandchildren of the 1875 testator Benjamin Looney, were alive and were parties defendant to the 1913 and 1917 suits and are now parties to the immediate suit instituted in 1960. Thereafter the record recites, "Trial by court. Judgt. for Plf. (Mr. Pufahl) for $500." To satisfy Mr. Pufahl's judgment the land was levied upon and on November 15, 1918, sold by the sheriff of Polk County for the sum of $440 to W. H. McGuire (Ola Ragan's great-uncle) who on March 22, 1919, for the recited consideration of one dollar, conveyed the land by quitclaim deed to Ola Ragan and her brother W. S. Looney. This latter deed was recorded on May 26, 1923 and together with other deeds was found in the lock box of Jesse E. Looney, Ola's father, on his death in 1958. In July 1930 Ola and her husband, Perry, succeeded by purchase, $1500, to the life estate of the Hellman bank (then in liquidation) and in 1942 by deed to her brother's interest and thus subject to the claim of the respondents has become the fee owners of the land. But the problem involved upon this appeal is the validity of the Pufahl judgment and the execution sale by the sheriff.

■ Specifically the respondents claim that the petition in the Pufahl suit failed to state a cause of action and that therefore the court had no jurisdiction of that action. The basis of the claim is that in the Hellman litigation "the defendants (the 19 minors) were the prevailing parties" and since the action was at law they as minor defendants were not chargeable with the fee which, they now assert, should have been taxed as costs against the plaintiff bank, the losing party. In the first place, this contention overlooks the dual capacity in which Mr. Pufahl acted. It was the duty of the court, after commencement of the suit and service of process, to appoint a guardian ad litem for the minor defendants (V.A. M.S. § 507.190) and that, admittedly, the court did. And it may be, as a general rule, as the respondents now contend, that a guardian ad litem is entitled to no other fee than "that which is taxed as part of the costs in the proceeding." 27 Am.Jur., (Infants) § 126, p. 846. But fees or costs chargeable as "remuneration eo nomine" are those allowed strictly for services in his capacity as guardian. Annotation 9 A.L.R. 1537. A court appointed guardian ad litem may of course employ counsel (Nagel v. Schilling, 14 Mo.App. 576) but if the guardian is also a lawyer he may also act as counsel for his wards and if he does and the services were necessary he is entitled to a reasonable fee for his services in that capacity or for his combined services. 27 Am.Jur. § 128, p. 846; Annotation 9 A.L.R. l. c. 1543.

■ Costs are statutory allowances to a party to an action for his expenses and there is no statute, except in partition, authorizing the allowances to a guardian ad litem as costs. Nevertheless, in particular actions such allowances, even in the absence of express statute, have been assessed as costs. Annotation "Allowance of fees for guardian ad litem appointed for infant defendant, as costs" 30 A.L.R.2d 1148. While there is no general statutory authority for fees to guardians ad litem, the duty of the court to appoint necessarily implies the obligation to pay and the power of the court to fix reasonable compensation. Jones v.

Yore, 142 Mo. 38, 43 S.W. 384; Jones v. Yore, 158 Mo. 83, 57 S.W. 1134. And if there is property or a fund in court for disbursement "there would seem to be no tangible reason why the court should not order such allowance to be paid out of the infant's interest in court." Walton v. Yore, 58 Mo. App. 562, 565; Tracy v. Martin, 363 Mo. 108, 249 S.W.2d 321. There was no fund in this case and while the subject matter of the Hellman litigation was the land it is not claimed that it was so in the hands of the court that it could by the court's mere decree be subjected to the payment of Mr. Pufahl's fee.

■ There is another factor to this phase of the appeal, Ola Looney Ragan, plaintiff in this suit, was one of the nineteen defendants in the Hellman suit and in Mr. Pufahl's action. And while she did not know or personally remember either Mr. Pufahl or E. L. Ragsdale or Lewis Luster, Springfield lawyers who had had no previous connection with the litigation, Ragsdale and Luster were employed to represent her and it was upon their motion that the court set aside its interlocutory order and the original $500 allowance to Mr. Pufahl. After Mr. Pufahl instituted his independent action against the minors, including Ola, these lawyers did not appear in her behalf and there was no contest by her to the merits of his suit for a fee. And as to the Pufahl suit, it is a general rule that "before a judgment will be set aside * * * the applicant for relief must show the existence of a meritorious defense to the cause of action alleged against him." Annotation "Scope and character of meritorious defense as condition of relief from judgment" 174 A.L.R. 10, 19. It is urged in another connection that there were two valid defenses to be made to Mr. Pufahl's suit, one, the reasonableness of his $500 fee, and, two, the fairness in that action of his attaching 258 acres of land, 58 acres in excess of the 200 involved in the Hellman case. No cases are cited as to the attorney fee and no argument is made to demonstrate the fact, and it would appear as a

matter too plain for argument that a fee of $500 for his services in the Hellman litigation was indeed reasonable even in 1918. It is not necessary to encumber this opinion with an explanation and accounting of the 58 acres, originally a part of the testator's farm. It was attached, it is assumed improperly, but for many years the title to this piece of land has been in the Pierce family and neither the plaintiffs nor the defendants made an effort to include that land or the Pierces' title in this litigation, there has been no decree in this case respecting it, the Pierces are not complaining and it is not in point of fact involved in this appeal. But recurring again to the general rule of a "meritorious defense," the mere statement of the rule indicates that it is not every defense, even as to a judgment for attorneys' fees, that will justify the setting aside of a judgment, and both of the claims made here fall in that category. 174 A.L.R. 1. c. 130, 147. In conclusion as to this point, if the fact entered into the trial court's rendition of the present decree, it may only be said, contrary to the respondents' assertion, that the court did have jurisdiction of the Pufahl suit.

The respondents' second contention with respect to the Pufahl judgment is that it "was procured by fraud" and was therefore void. The reasons given for this assertion are that the minor defendants "were involuntary parties" for whom a guardian ad litem was required and "yet O. P. Hollingsworth, as their guardian ad litem, contrary to his duty as such, and with the acquiescence of the plaintiff, Herman Pufahl, performed no duties nor services as such, obviously acted as a figurehead only, and did nothing to defend the minors, and was not even present when the Pufahl judgment was entered" and failed to make the two allegedly valid defenses of the reasonableness of Mr. Pufahl's fee and the unfairness of attaching 58 acres of land not involved in the Hellman litigation. In this connection it is said that all the documents, deeds and court files and records relating to the Hellman and Pufahl cases between 1913 and

1918 comprise "facts and circumstances tending to prove lack of actual trial of the Pufahl case," inequality of the parties, dereliction of duty on the part of Mr. Hollingsworth and "the existence of a scheme for Pufahl to collect his fee without contest, and for the minor defendants' interest in the land to be secured for Mary Ola Ragan and W. T. Looney (her brother) for a nominal sum, which when considered together amounted to collusion and fraud in the procurement of the Pufahl judgment."

The respondents' argument as to this point is set forth at some length because it is not proposed and is not necessary to a disposition of this appeal to answer each of these assertions and arguments in detail. It is not known just what an "involuntary party" to a lawsuit may be, in one sense at least most defendants are involuntary parties. Mr. Hollingsworth, aged 89 years when this case was tried, was called as a witness by the respondents. He became a lawyer in Polk County in 1911, was probate judge 12 years and retired about 1948. He was uncertain if not confused as to the dates of his admission to the bar as well as to other dates, in any event he testified that he had no recollection of the Looney land, did not remember whether he was present at the execution sale and as to whether he was guardian ad litem in the Pufahl suit said, "I don't remember a thing about it. I don't remember the case." It would serve no useful purpose to enter upon a further discussion of the duties of a guardian ad litem, as indicated there was in fact no valid defense to Mr. Pufahl's suit for a fee and while he may have methodically set about to collect his fee and in the process caused the property to be sold there was no nefarious "scheme" on his part and, without setting forth the record and demonstrating the fact, it may be said that there is no evidence whatever of "fraud" in the sense employed here on the part of either Mr. Pufahl or Mr. Hollingsworth in the procurement of the judgment. Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S.W.2d 1031; Reis v. La Presto,

Mo., 324 S.W.2d 648. It may well be that in his capacity as guardian ad litem Mr. Hollingsworth was not as diligent and vigilant as he should have been. It is also possible however that in 1918 he followed the usual if lax custom then prevailing of filing of a perfunctory answer, but as indicated there was no valid defense to the merits of Mr. Pufahl's suit for a fee, and the inferences permissible from the circumstances are not comparable to Kennard v. Wiggins, 349 Mo. 283, 160 S.W.2d 706, "In the present case the answer of the guardian ad litem did not invoke the frequently used answer of merely submitting the rights of the minor to the protection of the court, nor did the answer suggest the construction most favorable to the minor, but the answer suggested, as we see it, a construction (of "heirs of the body") detrimental to the vital interests of the minor defendant." It is not intended now to minimize the duties and standards of guardians ad litem but another purpose of the statute (V.A.M.S. § 507.190) requiring their appointment "is, that controversies be settled. * * * It is especially a matter of public interest that land titles be settled. If it were not possible (in the absence of fraud) to bind infants by court decrees, no matters could ever be finally adjudicated until all parties, who might be interested, arrived at legal age." Spotts v. Spotts, 331 Mo. 917, 931, 55 S.W.2d 977, 983, 87 A.L.R. 660.

In connection with the claim of fraud and also of some significance as to all of the respondents' arguments as to the Pufahl suit, judgment and execution sale there is one fact that cannot be ignored. When both the Hellman and Pufahl suits were instituted Mary Ola Ragan was a minor and an "involuntary party" to both actions. And on her behalf alone was the Pufahl fee contested in the first instance. In any event she was a party defendant along with her respondent cousins to all the litigation and now there is the obvious anomaly of her asserting the validity of all those proceedings of over forty years ago while the respondents assert their invalidity. Of

course, it is said that there was a scheme to secure "unto Jesse Looney's children (Mary Ola Ragan and W. T. Looney) the rights of all minor defendants in the Pufahl suit for a nominal sum." There was, as indicated no direct evidence of a "scheme" and the circumstances pointed to are the fact that Ola's great-uncle W. H. McGuire purchased at the execution sale for $440, and four months later deeded the land to Ola and her brother "with no revenue stamps on the deed." This deed was not recorded for four years and together with other documents was found in her father's lock box after his death in 1958. But whatever inference one may place upon these circumstances, assuming that Jesse Looney set about beginning in 1918 to secure the title in his children, there is no inference that he colluded, conspired or acted in concert with Mr. Hollingsworth or Mr. Pufahl, and his conduct or actions would not for these reasons be a ground or reason for setting aside the Pufahl judgment. In this case unlike many of those relied on, neither Mr. Pufahl as judgment creditor nor anyone for or on his behalf, either directly or indirectly, bid on or bought the property at the execution sale and thus as to this judgment and sale there is not to be "found from the evidence, as we now find, that the whole matter of the enforcement of this lien was a scheme" by one to collect an alleged debt of $55, by another to collect a fee and by still another to keep some of the parties in ignorance and thereby finally acquire title to the property for a wholly inadequate consideration as in Van Graafieland v. Wright, 286 Mo. 414, 430, 228 S.W. 465, 471.

■ The other circumstance relied on as making the execution sale "void" is inadequacy of the purchase price of $440. In support of this claim the respondents called three witnesses, one a neighbor 88 years old, evidently mistaken as to several important factors, who testified that in 1918 the *258*

*acres* were of the value of $80 an acre or $20,640. The other witness was the husband of one of the very few respondents who appeared in the cause who gave it as his opinion that in 1918 the 258 acres were of the value of $100 an acre. The third witness, respondent Utley Looney, also gave a value of $25,000.[1] The qualifications of these witnesses and the probative force of their testimony aside, the respondents, using these values and this acreage and the tables and examples for computing the value of life estates (V.A.M.S. §§ 442.530, 442.540, and 442.550) say that "the remainders of the defendants were worth over $6800." It is then said that $440 was a wholly inadequate price for the remainder interest and that the sheriff should have returned the execution unsatisfied. This computation included no doubt the interests of Ola and her brother and again, of course, Ola would necessarily uphold the execution sale. Then too a tract of 200 acres would reduce the respondents' total computations. And even if the computations are accurate the purchaser in 1918 was nevertheless buying uncertain remainder interests (it turned out to be exactly 40 years) and the chance of prolonged litigation. An officer conducting a public sale under execution may refuse to accept the best or only bid because it is inadequate, particularly if by reason of time or circumstance reasonable competition has been suppressed or there is some reason to suppose that a delay or another sale would produce better results. Annotation 110 A.L.R. 1077 in which the Missouri cases are collected.

■ But it has been pointed out repeatedly that "in every case where a sheriff's sale has been set aside in Missouri until 1938, there have been additional circumstances which provided grounds for setting the sale aside" (8 Kansas City L. R. 192; Davis v. McCann, 143 Mo. 172, 44 S.W. 795) usually fraud. Van Graafieland v.

---

1. Incidentally the 1920 census shows 3,-450 farms in Polk County with a total acreage of 379,211 acres and a total valuation of the land and buildings of $23,- 977,258, producing an average price per acre of approximately $63.22. Missouri Year Book of Agriculture, 1921, p. 282.

Wright, supra. This rule has since been modified when the consideration was so shockingly inadequate as to constitute fraud. Wieser v. Linhardt, Mo., 257 S.W.2d 689. While in retrospect a hypothetical inadequacy of consideration may be demonstrated, there is no compelling or shocking inference in a 1918 sale of numerous remainder interests for $440, and the circumstances do not warrant the inference of neglect of duty on the part of the sheriff in completing the execution sale. V.A.M.S. §§ 513.235, 513.275; Hammond v. Scott, 12 Mo. 8.

■ Under the statutes the devise in grandfather Benjamin Looney's 1875 will to his wife during widowhood, then to his three named sons "and the heirs of their bodies" created a life estate (the Hellman bank's interest) measured by the lives of the three sons, the last of whom died in 1958, and contingent remainders in fee in the parties plaintiff and defendant to this appeal. V.A.M.S. §§ 442.490, 474.470; Kennard v. Wiggins, supra. And in this connection it should be parenthetically noted that throughout the years of the life estate and since 1918 the contingent remainder grandchildren had an interest that they could sell and convey by quitclaim (Grimes v. Rush, 355 Mo. 573, 197 S.W.2d 310, in which Mr. Pufahl was counsel) or protect by suit, including a suit to quiet title. V.A.M.S. § 527.150; 2 Restatement, Property (Future Interests) §§ 162, 165; Fountain v. Starbuck, Mo., 209 S.W. 900; Annotation 144 A.L.R. 769, 781, 803. And the remainder interest may be protected even though the statute of limitations may not run against remaindermen until after the death of the last surviving life tenant. Revare v. Lee, Mo., 257 S.W.2d 676. In any event the respondents' final contention is that the present decree in their favor is proper "because otherwise the effect(s) of the Pufahl judgment and sale(s) under execution(s) on said judgment would be the wrongful destruction of defendants' rights as remaindermen under the will of Benjamin Looney." In other words, the respondents contend for the indestructibility of contingent remainders ("The Destructibility of Contingent Remainders in Missouri," Willard L. Eckhardt, 6 Mo.L.R. 268; 25 Mo.L.R. 392), at least in the circumstances of this case in which they assert "that the procuring of the judgment by Mr. Pufahl for his guardian *ad litem* fee developed into a scheme" to accomplish that purpose. Fountain v. Starbuck, supra; Hughes v. Neely, Mo., 332 S.W.2d 1.

As has been indicated, it is not a fair inference from this record that Mr. Pufahl was a party to a "scheme" either to secure the title to this property in Ola or to cut off the contingent remainder interests of the appellant Ola and the other respondent Looney descendants. This case is in nowise comparable to Fountain v. Starbuck, Hughes v. Neely, or to many other cases, including Picadura v. Humphrey, Mo., 335 S.W.2d 6, in which in addition to inadequate consideration and wholly without reason for parting with valuable property the court also found actual fraud in the procurement of a judgment all directed to the purpose of eliminating "heirs of the body" from a deed, thus improperly destroying their remainder interests. To further but briefly illustrate and distinguish, in Jones v. Arnold, 359 Mo. 161, 221 S.W.2d 187, the court found fraud in the procurement of a judgment reforming two deeds by striking out the words "and his bodily heirs." In part, the court said, "The defendants in the prior suit had a valid meritorious defense thereto, to wit, that the words sought to be stricken out by reformation were intentionally inserted; that the estate conveyed was in compliance with an agreement entered into between the widow and children of J. H. Arnold; and that the deeds were executed in the form shown to carry out an intention expressed by J. H. Arnold in his lifetime." The court found fraud and collusion and thereby minors were deprived of their meritorious defense, and, finally, "the original action was not prosecuted in good faith, but was a mere scheme and plan to use the lawful processes of the court to wrongfully deprive the defendants of their interest in the

described real estate" by destroying the contingent remainders. And in Moore v. Moore, Mo., 329 S.W.2d 742, a 1925 tax sale of 520 acres of land was set aside. But a grandson caused the tax suit to be instituted, there was an agreement in writing that an uncle should become the purchaser and reconvey to the grandson upon payment of taxes and expenditures. It is not necessary to detail the circumstances, the court concluded that the grandson and uncle "so manipulated the record title thereto as to receive the benefit of the full value thereof after freeing them, as they thought and intended, from entailment to the heirs of the body of Paul Handy." The very title of Professor Eckhardt's leading article, "The Destruction of Contingent Remainders In Missouri," carries the suggestion that contingent remainders are not in all circumstances inviolate and may not in any event be destroyed. It is believed, as the cases indicate, that remainders may not be improperly destroyed, collusively or fraudulently, or for the purpose of thwarting some lawfully manifested intention of a testator (Gordon v. Tate, 314 Mo. 508, 284 S.W. 497), or for the single and avowed purpose of ridding property of what someone may deem an unnecessarily vexatious restriction on the transfer and acquisition of title to property.

As guardian ad litem and in his capacity as a lawyer in representing the minor "heirs of the body" in the Hellman litigation Mr. Pufahl was entitled to a fee. At the instigation of or on behalf of at least one of the heirs his right to compensation was resisted and disallowed as an integral part of the Hellman case. The consequence was his institution of the suit for a fee against his former wards, his attachment of the land and finally his becoming their judgment creditor. There are two views, sometimes depending on particular statutes, as to whether contingent remainders may be sold on execution. 21 Am.Jur. (Executions) § 414, p. 207; Annotations 60 A.L.R. 803; 30 L.R.A.,N.S., 115; 23 L.R.A. 642. The rationale of the conflicting views and the

policy considerations confronting courts are fully examined and set forth in 43 Minn. L.R. 217, Halbach, "Creditors' Rights in Future Interests." Professor Simes takes the general position that "whatever the debtor can voluntarily convey can also be reached by his creditors," and, therefore, of course, contingent remainders would be subject to levy and execution. Simes & Smith, Future Interests, §§ 1923–1925. And that is also the view of the American Law Institute, subject of course to the restriction that the interest is not a part of a trust and is one the debtor may transfer (2 Restatement, Property, Future Interests, Sec. 166) and subject also to the caveat generally applicable to purchasers at judicial sales that "the *real* equities, and not the paper equities, existent at the time of the [execution] sale are controlling." Munday v. Austin, 358 Mo. 959, 218 S.W.2d 624, 630.

In this jurisdiction "real estate" within the meaning of the execution statutes includes "all estate and interest in lands" (V.A.M.S. § 513.010), and property liable to be seized and sold on execution includes "(5) All real estate whereof the defendant, or any person for his use, was seized, in law or equity, at the time of the issue and levy of the attachment, or rendition of the judgment, order or decree whereon execution was issued, or at any time thereafter." V.A.M.S. § 513.090. For more than eighty years under these statutes, subject to the noted caveat, remainders have been subject to execution "whether the estate in remainder thus created was vested or contingent * * * the interest of said Joseph H. Mc-Pheeters was an alienable interest, and, therefore, subject to sale under execution." White v. McPheeters, 75 Mo. 286, 292; Gordon v. Tate, supra; Bock v. Whelan, Mo., 30 S.W.2d 607, 608; Kay v. Politte, 344 Mo. 805, 810, 129 S.W.2d 863, 865, 122 A.L.R. 1145.

In view of all these considerations the judgment is reversed and the cause remanded for the entry of a decree in conformity with this opinion.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.